Madam Clerk, will you please call the first case? 111772, people representing James Mandarino. Morning, Counsel. Good morning, Honors. Erin McCurdy-Levy for the defendant, James Mandarino. I believe my argument will take about 10 minutes, and I'd like to reserve – I'm sorry, 15 minutes. I'd like to reserve about 5 for rebuttal. Very good, Mrs. Levy. Good morning, Counsel. Good morning, Janet Mahoney on behalf of the people of the state of Illinois, and I expect my argument to take approximately 15 minutes. Very good. Mrs. Levy, please proceed with your argument. Honors, are the microphones on? Yes. You don't hear them? But they don't answer on time. They report only. Okay. You need to provide your own application. Thank you, Judge. Honors, I'd like to start out by saying that criminal defendants in Illinois are entitled to a fair trial, not a perfect trial, and they're entitled to be proven guilty beyond all reasonable doubt. And I believe that there were five major errors in this case that prevented the defendant from being found guilty beyond reasonable doubt. Two of those issues are evidentiary in nature, and for the purposes of my prepared remarks today, I'd like to focus on the three issues that I believe go to the sufficiency of the evidence as opposed to those evidentiary issues, the first being that the trial court applied the wrong legal standard when it evaluated this case. It used a provocation standard as opposed to what the cases, I'm sorry, what the statutes tell us is a reasonableness standard. Whether an officer is legally justified in his use of force in arresting an individual should be evaluated under the standard of a reasonable officer on the scene facing the circumstances that he faced. The second issue that I'd like to address is that the state failed to prove beyond a reasonable doubt on the issue of legal justification because they simply didn't put in any evidence that a rational trial or fact could evaluate in determining reasonableness. The last issue is that the trial court made a speculative and unreasonable inference regarding a piece of evidence, and he relied on that in his decision. I'd like to start with the first issue that I mentioned, which is the legal standard of provocation versus reasonableness. Counsel, where is the legal standard found? Your Honor, I believe it's first found in the statute. Is that 6 and 75? That's correct, Your Honor. Okay. Where it says that a peace officer need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance. He's justified in the use of any force which he reasonably believes necessary to effectuate the arrest and of any force which he reasonably believes necessary to defend himself or another from bodily harm. So that's where we get the standard. And from the case law, we know that we judge that reasonableness from the perspective of a reasonable officer on the scene faced with the circumstances that Corporal Mandarino faced that evening, that early morning, actually. The amount and quality of the information that he had at the time is crucial to that determination. And I cited several cases because I believe that this was an incorrect legal standard that the trial court used. I believe it should be reviewed de novo and that the court should look at that legal standard anew and, taking all the facts that were adduced at trial, should re-evaluate that and whether or not his actions were reasonable. We can also use the video to determine whether or not the officer's actions were reasonable. Is that correct? Well, I do believe that the video is obviously a key piece of evidence in this case. And as the trial court stated, there was a motion in lemonade in this case that the state filed to bar the expert testimony of the defense expert witness in use of force. They believe that expert testimony was not appropriate or necessary in this case. We believe that that is not true, that this is not something that's intuitive, whether an officer, excuse me, the force that an officer is allowed to use. We don't think that that's something intuitive that any fact finder could find without specialized testimony. And the judge agreed. He said, I think it's appropriate for expert testimony in this case. And he denied the motion. Didn't the judge in his ruling state that he was considering a rational analysis of the videotape? In a rational analysis, there's many factors he would consider.  I do agree with you that a rational analysis would hopefully be from a reasonable point of view. But what the judge stated in his decision was that he was looking at this from the perspective of provocation. He said it several times. In fact, in his entire decision, he never mentions the word reasonable or unreasonable even once. But again, he's looking at a lot of circumstances. I mean, one circumstance would be provocation. And you're not saying that just because he used that word, that in and of itself means that he didn't consider it a rational analysis. I do believe that's true. But what we have to go on is the word that he did use. And the statute specifically says reasonable. And it mentions provocation nowhere in there. In fact, it says a peace officer is not required to retreat or desist for resistance or threatening resistance, i.e. provocation. Indeed, that more clearly suggests that he used the self-defense standard. Because that's where provocation would come into play, right? I agree. And this is a situation where he's an officer in his official capacity. He's not required to wait until someone strikes him or hits him to act. But provocation doesn't only mean something physical. Someone can provoke you by their words, not only their acts. That's so that a police officer who somebody yells something and goes off, that's without provocation. That's right. But again, what we have to go on is the language he used. And I believe that it shows that he was looking for something that is not required to be there. Counsel, would you speak to your argument as it relates to your allegation that there was error in the use of opinion testimony as an unqualified expert by the deputy chief? Yes, Your Honor. I'm happy to do that. As it relates to the ultimate issue of fact. Sure. Your Honor, in my brief, the first issue that I commented on is that the court improperly allowed a state's witness to testify as an expert in this case and give his opinion on the ultimate issue, which is whether Corporal Mandarino's actions were reasonable. I don't believe that this is proper. The witness, the burden is on the proponent of the testimony to qualify someone as an expert. That was never done in this case. Well, would you agree that a witness, whether an expert or a lay person, may provide an opinion on the ultimate issue of fact? No, I don't believe that it's proper for a lay witness to give his opinion as to the ultimate issue. Even if the Supreme Court of Illinois has so said it. Your cases are all 1972, 1990, 1988. Have you read People v. Terrell, a 1998 case where the Illinois Supreme Court stated that we note that it is now well settled that a witness, whether expert or lay, may provide an opinion on the ultimate issue in a case? That case, notwithstanding, I don't believe a proper foundation was laid for his testimony. The court would have no way to evaluate the veracity of that opinion and whether that opinion is proper. Would you agree, counsel, that it would depend on what that ultimate issue of fact is, that there are some factual questions that a lay person can answer and give an opinion to, such as intoxication? I would agree with Your Honor on that point. In a more specialized area, you would require expertise. Yes. Would that be fair? Absolutely. And I believe that the judge tells us, he even says, and I think his words are very instructive in denying the state's motion in limine. He says, I've been a judge for a number of years, but even I don't believe that I am, I don't know what is justified use of force. So if even the judge is unclear on that, then... That would certainly speak to why the United States motion in limine would allow an expert to provide some direction and guidance. That's right. But what about, you talk about Rule 701. I do. What about 704? Opinion on ultimate issue. That says that testimony in the form of an opinion or inference, otherwise admissible, is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. I would still argue that it's not proper when a foundation for that opinion hasn't been laid. This was something that was caused by the defendant's questioning. It opened the door to these issues. I would agree that to some extent it did open the door to testimony. However, on redirect, the state had an opportunity to ask the witness about proper police procedure, about what would be reasonable behavior to effectuate an arrest, questions of that nature that a police officer, especially a deputy chief of a police department, would be qualified to answer. They neglected to ask those questions. Refresh my recollection here. My recollection of the facts of the record are that the defense opened the door to the subject matter, to the area of what do you do in a high-risk traffic stop. You're a single officer present and there are multiple individuals that you're dealing with. So that was the area which he opened the door for the state to then later probe. But did they open the door in your judgment as to the ultimate issue of fact in this case, and that is was it a reasonable use of force and context? I don't believe the defense opened that door, Your Honor. I don't. You're correct. Their line of questioning was geared toward what is appropriate when dealing with multiple offenders. And I believe on redirect, the deputy chief testified that what you want to do is you want distance and space, that an officer would seek to distance himself from multiple offenders so that he can view both of them and anticipate their actions. But I don't believe that that goes to the ultimate issue, Your Honor. So the statement by the deputy chief regarding distance, that's okay? I'm sorry? The statement by the deputy chief answering the question, he said, I thought he should have stayed where he was with cover and distance behind the squad car door and not approached. I think it would be appropriate for him to say that an officer should maintain distance and space. That is within the realm of his experience, the scope of his knowledge. I don't believe it's proper for him to say after watching the video, I believe this defendant behaved improperly because he did not maintain distance and space. Why is that? I mean, because he was testifying about the video. He hadn't seen the video. He also testified that he was not a part of this investigation, that he actually intentionally stayed out of the investigation and demanded Reno's conduct. So again, I don't think his testimony was proper. On those two points, I don't have anything further. I would like to just end by saying that the state has a burden of proof in this case, and they neglected to put in the proper testimony so that a rational trier of fact could evaluate whether Corporal Mandarino acted reasonably. They had the opportunity to do that with their police witness, but they chose not to. And even taking all the evidence and the like most favorably to the state, I don't think that a rational trier of fact can make a determination that he acted unreasonably or without legal justification. And on that, I'll rest for the moment. Thank you very much, Mrs. Levy. Ms. Mahoney. Good morning. Again, Janet Mahoney on behalf of the people of the state of Illinois. The trial court in this case absolutely applied a reasonable standard. He prefaced his comments by referring to a rational analysis of the evidence that, in and of itself, establishes that he knew what the job before him was. Just because he used the term provocation when discussing that evidence doesn't mean that he applied that standard. In fact, it was the defendant's defense in this case that injected that provocation into it, and the court was merely responding to that. In his closing arguments, the defendant was talking about how Ronald Bell refused to follow commands. What page is that, Kelsey, of the record? For the closing arguments? It's in the appendix. The closing arguments were not made part of the record on appeal, and the people attached it to their appendix in this case. Also in closing arguments, the defendant's theory was that Ronald refused to go to the ground. He started to rise. He felt like he was going for it. The defendant felt as if he was going for his gun. These are all elements of his defense of provocation, and in responding to the defense raised by the defendant, the court used the term provocation. In no way does that mean that the court applied a provocation standard in this case. This isn't merely a semantics difference. Those are completely different legal concepts. Reasonableness and provocation are two separate, distinct matters. Would you disagree with that? Provocation as it was used in this case by the court was not used as a legal standard. It was used as the everyday term. Responding to Ronald wouldn't listen to me, Ronald wouldn't get to the ground, Ronald was rising up, Ronald was going for my gun. I had to do something. It's the everyday term of provocation that was used in this case, not a legal standard. The legal standard the court used was a rational analysis. There is nothing other than using that term in the generic sense of everyday language that can be pointed to in this record that indicates that the court wasn't aware of what it needed to do in this case. Reasonable doubt standard. At what point does the police officer in this case commit a crime? At what point, precisely? You could point it to many places. Point to the first point. Commits a crime. At what point does his conduct become criminal? I'm going to start with the last point, which is the baton. Then you can argue the tasering of the passenger is possibly a crime. Then you can argue further back. Was he charged? He was not, so that is not before, but you're asking me what's a crime. So we're going to start with the clear and obvious, which is the last point in time, which is before this court, and that is using the baton on the driver. You can argue that using the taser on the passenger two times was arguably a crime. Pulling the gun out at the initial time when he jumped out of the car. Don't know if it's a crime. I'm not saying it's a crime. It's questionable action, isn't it? Well, let me ask you this. What do you do? You're a police officer. It's approaching 4 o'clock in the morning. You're into your 10th hour of your shift. You have two individuals that haven't stopped after you've activated your emergency lights until they're in the driveway of what they would reasonably, I could argue, conclude as a safe haven, and they get out of the vehicle. Contrary to instructions, as I read the record, the officer says, Streamwood Police Department, stay in your vehicle. In response, they both emerge from the vehicle. A combative, aggressive scene develops, and they don't comply completely with his instructions. At that point, the officer withdraws his weapon. Once he secures partial compliance, then he reholsters his weapon, doesn't he? To pull the taser out. No, no, no. At one point, he holsters his weapon, at that point, right? At some point, when he achieves partial compliance, he reholsters his weapon, right? So is that outlandish? Is that egregious? When he doesn't know what's coming out of that vehicle other than people acting contrary to his official commands, so to secure himself, he withdraws his weapon.  Is that unreasonable? As you can see on the video. Another question is, is that unreasonable? Well, the facts that you've described to me are not clearly the facts that are on the video. That is not exactly what happened here. As you can see on the video, the police car is not ever really behind this car during the stop. He activates his lights. The car, they're never really on the same street. This car is driving as if he has no idea anyone's behind him because the defendant really never is behind him. He gets into his driveway, his home, and he gets out of the car just like any other person does. Any other intoxicated person. That is not the issue here. It's a relevant fact. This is every person in the world. There is no proof at the time that he stops that car that this person is intoxicated. It is a simple traffic stop at this point. Wrong. Reasonable, articulable basis for the stop. Would you agree? No. You wouldn't? You don't think there was a legal basis to stop this car? No. Not from what you can see on the videotape. You're not being reasonable. If we have unrebutted testimony that the tires are squealing, that he's veering out of his lane, a violation of 11709 of the vehicle code, that he nearly strikes a curb, that he's driving recklessly and pulls into the driveway, that, are you suggesting to this court, does not provide a reasonable, articulable basis to justify a Terry stop? That would, but that's rebutted by the video. Well, that's your view, I suppose. Go ahead. Well, exactly. It's arguable. Arguable. There are two versions of what occurred here. You just kept on telling me that the squad was never all directly behind the vehicle. So that means the video could have never captured the manner in which the vehicle was operating. As he was sitting in the 711 parking lot and the vehicle is driving down the street, you can see the way the vehicle is driving. And arguably, he's driving in a reasonable manner. Nothing that would justify a stop in this case. However, we are straying far from the point that we have here, and that is the actions of the officer on that driveway at the time that he took the baton and he struck this victim 15 times. Okay, let's put it in context. See, that's the problem that I have with this case. It strikes me that perhaps a myopic view of this case occurred because there was so much emphasis placed, and it's a key piece of evidence, the video, but it was almost to the exclusion of everything else. The trial court specifically made credibility findings. The trial court said contrary to the testimony of Bell and his passenger, they were both highly intoxicated. He found them to be incredible. So if we're left with just one witness to what happened there, it's the officer, and he never made a finding that his testimony was incredible, but the other two were incredible, we have to accept the officer's testimony as the narrator of that video. Don't you think it's important that we have some narration to an audio-less videotape? You are forgetting the testimony of the brother in the house. I'm forgetting nothing. And you're forgetting also the testimony of the neighbor. Please don't say I'm forgetting things because I have a very clear understanding of this case. I trust that you understand and know this case as well as you do. We do not just have the officer's testimony and two incredible testimonies of the driver and the passenger. We also have the brother in the house, and we also have the neighbor who's watching these events unfold. So it is not just a videotape versus the officer. There is far more evidence in this case than just that. And they were unreported. Well, actually, it was rebutted. Number one, he said that it's important to get into the mind of the defendant to know what his actions were, yet he never spoke to the defendant in this case. He referred to the baton saying, if you use it as a club, that's improper, but he didn't use it as a club here. He used it like a baseball bat, so therefore it's proper. He also, at this time I'm not finding the other part that rebutted his testimony. However, he was not 100% credible in this situation, having never spoken to the defendant himself. Did Bell and the passenger comply with the officer's instructions? They complied somewhat. Did they comply 100%? No, they didn't. It is clear on the video there was confusion. Was this a high-risk traffic stop? Not at all. You have three individuals who he has no knowledge of. Two appear to be highly intoxicated, using aggressive behavior and fanning towards him, and he's all by himself. That doesn't pose a high risk in your judgment? You have two individuals. The question is, does that pose a high risk in your judgment? If those were the facts of the case, I might change my mind, but those are not the facts you have in this case. You have a driver and a passenger who stop their car in their driveway of their home, and they exit like any other human being would. When he tells them to stop, they stop. One of them has his hands in the air nearly the entire time, complete confusion on their faces. There is not a third individual until later when he is awakened by all the noise going on outside. It is two people confused on opposite sides of the car. What led to that confusion? The intoxication? Or the instructions. Or the fact that a police officer is on their driveway with a gun pointed at them, and they are nervous. What the heck is going on? I'm just in my driveway. In a 15-year career, is there any evidence that any other individual who was arrested by this officer was confused or complained about confusion, or that he was aggressive, rude, or even displayed a bad attitude? There is nothing on this record saying that. In fact, the character evidence in this case is evidence of peacefulness, isn't it? What we have on this case. However, getting to the second issue of having to do with the officer's evaluation of the defendant and his testimony about his actions being unreasonable, he was not called as an expert witness. That information came out on redirect examination after the defendant questioned him about this officer's evaluations and went into detail about facts such as your leadership, your training, your experience. Have you ever had anyone ever complain about you? Therefore, indicating that because nobody's ever complained about you, you should have been, you acted reasonable here. Well, on redirect examination, that's when the people started asking him, okay, well let's evaluate him. We've got some live video footage here. We have some live video footage of the way he acted in the field. Let's evaluate that. And that's when the officer started going into his evaluation of how he acted here. We understand the importance of these tests, but proceed, counsel. So at the time that he was testifying about the use of the baton and whether it was appropriate was response to what the defendant opened up on cross-examination that far exceeded what was brought out on direct examination. It was also proper via the doctrine of curative admissibility. He opened the door to the evidence. He opened the door to this evidence through an evaluation performed by other officers. Can you tell us about the doctrine of curative admissibility? Certainly he opened the door somewhat to the subject matter, subject area, but to elicit an unqualified expert opinion on the ultimate issue of fact, he didn't open the door to it. To utilize the doctrine of curative admissibility, you'd have to show somehow that the state's case was damaged. In reality, it was the defendant's case that was damaged through that cross-examination and the state's case advanced. Wouldn't you agree? Not at all. It was the defendant's case that was advantaged because it was bringing out his evaluation on prior occasions. He's a stellar officer. That's not the point. The question is as it relates to how you conduct yourself at the scene and what you should do under these circumstances in a high-risk setting with multiple individuals, when there's a single officer, that subject matter. That's what they're talking about. That advanced the state's case, it would seem to me. The state's case was not harmed in that respect, and that's the area, the subject area, to which the non-qualified expert ultimately rendered his opinion on the ultimate issue of fact. The cross-examination of this officer, Deputy Chief Officer Keegan, was, have you worked with him? Yes, he's great. Have you evaluated? Yes, I have. I reviewed the evaluation prepared by these two officers. It contained ten areas. He received outstanding marks on everything. His leadership was outstanding. His training and experience was outstanding. This was an evaluation done by other officers that he was now relating to the trier of fact about what a great officer this was. On redirect examination, the people simply had him evaluate defendant just as the defendant had during cross-examination through the video and asked, now, were those reasonable actions? Was that a stellar performance? Would that receive an outstanding remark? Would that be the best thing? Would he get the best mark on that? No. Who asked him for an opinion on the reasonableness of the defendant's conduct as it relates to the baton? The statement at issue is the use of baton was inappropriate and unnecessary. That's what. But the question used the term opinion, right? They asked him his opinion, what he thought, and the ultimate issue of fact, right? They asked him his opinion of how he behaved on this situation in this video. As it relates to the ultimate issue of fact, would you at least concede that, that they adduced an expert opinion? As it relates to the use of a baton as a deadly weapon, to that particular fact of the case itself. Let's look at the exact question because I think it's a little different. The question was, what do you think Officer Anderino's personal skills were? They're talking again about his skills, which is a subject matter of the redirect. I don't see where the opinion might be. But he's asking directly his personal skills with regard to the baton. Right, with regard to this event that he's evaluating, just like he evaluated him on cross-examination. It was an evaluation of his behavior in the field. Just like it was okay for him to evaluate him on cross-examination based on past evaluation prepared by other officers, then let's evaluate you based on this. Because your evaluation you're relying on from cross-examination is suggesting that he is a great officer who has never done anything wrong, never had any complaints. Therefore, we should say that he hasn't done anything wrong here. Well, let's evaluate this. It's an evaluation. That's disingenuous. There were more than one question. There's not just one question. There were multiple questions where the response was, I thought he should have done X, Y, and Z. State, would it have been a safer thing to do in your opinion? Then he goes on to say, just use his hands. Well, what do you think his personal skills were when he began swinging the baton? He's speaking to the ultimate issue, and they're eliciting that opinion. That's not just what are the general guidelines in a situation like this. How should an officer react? Not that. Where should you position yourself? How much distance should you keep between yourself and the suspect? Those aren't the questions. That's the area that I believe was open to inquiry by a defense counsel's cross-examination. The ultimate question is, was his use of the baton reasonable? That's the ultimate question of fact, and that was elicited by a non-qualified expert or from a non-qualified expert. Would you disagree with that? I still... Because if you disagree with that, then you don't need the doctrine of curative admissibility. I still propound that this was an evaluation, just as he was allowed to evaluate on cross-examination. In evaluating someone, you are giving your opinion on how they act. He evaluated how he acted on prior occasions through those opinions given on cross-examination, and now he's evaluating what he can see on live video footage. On the reasonableness of force in this context, right? He was allowed to testify before that he acted reasonably all the time when he interacted with the public. He was outstanding. He was reasonable. That goes to the general character of the defendant and his peaceful, non-violent character trait. This is different. This goes to the ultimate issue of fact. Do you see that distinction? It also speaks to his... I see what you're saying. Counsel, let's conduct ourselves like we're in a courtroom. Let's not talk at the same time. Do you see the point? Do you see the difference? I see what you are saying. Do you see the difference? I see that he was evaluating the live footage like he would do for a written evaluation that could be used in the future, and he was doing it in response to the evaluations that were given on the cross-examination. Let me say this. First of all, let me apologize if I'm being harsh because I take a good, hard look at this case many, many times, and I don't mean to be overly aggressive, if you will. I believe very strongly in civility in our courts. But I find much of what you're saying to be disingenuous and inconsistent with the record. Let's talk about the continue, the use of force continue. There's expert testimony, unencased, under-butted, undenied, that there are multiple levels for the use of force. And that expert testified specifically that the applicable levels in that continuum are, first of all, the first level being the officer's uniform presence. Then he talks about the next level is verbal commands. He had a uniform presence. He gave verbal commands. The next level is hands-on. If you don't get compliance, hands-on physical grabbing of an individual. It was to that sequence. That was not effective. The next level is a taser or puffer spray. At the point that the baton was used, the taser was no longer operative because he had to use it on the individual who was leaving the scene and going into a house for unknown reasons at 4 in the morning and contrary to commands. He then took it to the next level, which was the use of the collapsible baton. The expert testifies that under certain circumstances, and it's all contextual, you can go from level 1 to level 4. You can go from level 1 to level 6. But in this case, this officer took it sequentially, step by step by step, upward in the use of force continuum. Would you agree with that? The expert also stated... Ma'am, I want to be civil with you, but you have to respond to the court's questions. Would you agree with that? And then you can elaborate, but would you agree with what I said? Was he at the final step of the continuum? Yes, he was. No, no, that's not the question. Did he go through this use of force continuum sequentially from step 1 to 5? Would you agree he did? As for justice, I understand you're an advocate, but your role and my role is to achieve justice. The defense counsel's role is to zealously advocate to secure an acquittal of the defendant, or a reversal of conviction. You and I have to get to the heart of this. Counsel, if you disagree, say you disagree. If I could just finish. I just don't want to be combative here. I want you to just answer the question, and then you are free to take all the time you want to elaborate. If you disagree, say you disagree. I disagree. Fine. Explain to me, if you will, where your disagreement arises. Because the expert said what he should have done was taken a step back and wait for reinforcement. He should have never approached these individuals to begin with. He put himself in a position when he was dealing with the passenger where his back was to the driver. He clearly wasn't that worried about the driver at that point. When he was dealing with the driver, he had his back to the passenger. There are things that this officer did here that weren't reasonable and also don't support this idea that he was allowed to reach the final use of force on the continuum. Also, the use of force in this case, the use of force that results in death or great bodily harm, can only be used in certain situations. And that, in this case, could only be whether he was in fear of death or great bodily harm. And we simply don't have that situation here. You know what is interesting? We finally found a point of agreement that this wasn't a textbook case. That everything wasn't done perfectly. Because it's not a perfect world. It's 4 o'clock in the morning. You have two belligerent drunks acting aggressively, using profane language, with the passenger walking into a house, holding some shiny object that the officer hasn't identified, defying his commands, turning right to his face, looking at him as, F you, I don't have to listen to you, and going into a house. We don't know what's in his hand. The officer doesn't. What's on his person? Why is he going in the house? Why is he not listening? I'm trying to just effect a traffic stop. And that's what he's faced with. And in that situation, he felt compelled to tase him. That strikes me as reasonable, that situation. To immobilize him, for as the testimony indicates, and the record bears out, up to five seconds. It was at that time that the driver, Bell, emerges from the car, contrary to instructions, and now he's got a third person coming to the door, and it's 4 o'clock in the morning, and it's pitch black out with some artificial lighting, and this is what he's now faced with. Complete noncompliance. But, I mean, the question goes to. That's my question, so let me control it. Wait one second. Wait one second. Ask your question. Just disturb, and then we're going to let Justice Hines in. What's your question? Just the question. That's what he said. What's the question? That's what he said. You've laid the foundation. What's the question? And my response is we're here for the actions against the driver as he's on the ground, on his knees with his hands in the air, and at times shielding his face. That's what we have here. That is the crime that we are dealing with. When it relates to the issue of the use of the baton, the record indicates that the training is to strike repeatedly and forcefully until compliance is achieved. Would you agree? That's what that says. Okay. Now, if the officer directs this individual to lie prone on the ground and he gets into what the expert characterized as a wrestler's position on his hands and knees. Now, we all know from our common experience, a wrestler's position is where you start a wrestling match, and in a second and a half you can pin the guy standing next to you. So that's why he wants him in a prone position. Would you agree to that, the reasonableness of that? He never asked him to get in a prone position. He told him to get down on the ground, and what every common sense human being thinks, they get down on their knees, and that's what he did here. He got down on his knees. When he said get down all the way, he gets down into the wrestler's position. I mean, he is doing what every reasonable human being would do. Ma'am, doesn't the video reflect that the officer then points his flashlight to the ground to show him further get down to the ground, and then before the use of the baton puts his hands down to break his arm and to push him down all the way to the ground, and isn't the testimony of that he was raising his back and stiffening his arms and resisting? Isn't that what the record shows? That's his testimony. The video, as the trial court says, speaks a million words. The video speaks a million words, and when you have someone for a traffic offense who's in their own driveway on their knees with their hands in the air and then shielding their face as somebody's wielding a baton over their head and striking with full force, that's not reasonable. That's not what we as a society should expect in a situation like this. Let me ask you this. How many of the 15, do you agree there was 15 baton strikes? That's what the record is indicating. Yeah. How many of those were to the head? One. And did that begin with a glancing blow to the shoulder? It's really hard to tell. I didn't think so. But not one was directly applied to his head, was it? Again, there's no indication it was. There's no indication it wasn't. We have a blow to the head. We have someone who feels that their arms and back are broken. Ma'am, let me ask you this. Let me ask you this. Did your view of the videotape reveal to you one instance of the 15 strikes where the officer came down directly onto the head? No. What I did see is an adult man with a metal baton raising it over his head and striking down on a man who's on his knees with his hands shielding his face. That's what the record showed. Now let me ask you this. Once additional officers arrived on the scene, oh, by the way, before I get there, now at some point the officer stops using his baton, right? And that's when his brother emerges from the house and just pulls his arms out and he lies prone, right? So it wasn't that he couldn't understand what he was supposed to do, and there's no evidence to contradict that the officer said he was arching his back and stiffening his arms and wouldn't go down in compliance with my commands. Isn't that true? I disagree with you. What the evidence in the record shows is that the brother comes out and tries to bring a voice of reason and a voice of calm and says he doesn't understand what's going on and he had to physically show him how to get down on the ground. What it was that was the expectation in here, because when you say get down on the ground, getting down on your knees to many people means I'm down on the ground. Well, how would a reasonable person interpret when you're on your hands and knees somebody pushing down on your shoulder and breaking your arm brace? That he's going to hurt me. Would that lead a reasonable person to conclude I'm not down far enough? No, it's going to lead a reasonable person to think I am in some trouble here, I am going to get hurt. A reasonable person, first of all, having seen somebody, something happened to the taser to the passenger. The reasonable person wouldn't have known that. He did. That's why he got out of the car. He was looking to see what was going on with his friend who just got tasers on the ground and might be hurt. And then the cop or police officer comes over to him and starts yelling and now he's nervous. I would think that would be a reasonable expectation and that he might be in some danger. I would agree with that. I definitely would agree with that. I find it significant that you have these two people that he's in fear of on opposite sides of the car. So it's going to be a little bit hard for them to tag team and attack on this police officer because they're on opposite sides of the car. One of them has his hands in the air almost every second of this encounter. You're talking about the driver. The driver. And is interjecting to see what's going on with his hands in the air in a non-threatening mode in terms of attacking the police officer. And also important is that as the officer dealt with each individual, he was unaware of the actions of the other person. He had no idea what that driver was doing when he was dealing with that passenger and he had no idea what that passenger was doing when he was dealing with the driver because he wasn't that concerned. Ma'am, were there any injuries sustained by the driver at all other than the glancing blow off the shoulder to the ear? He testified about feeling as if his arms and his back were broken. There was testimony about bruises. And he received discharge instructions on concussion. I want to be real candid about this. The treating doctor said he had no concussion. It wasn't her opinion that he had a concussion. And all the paramedics who dealt with him, and one of them said, in my 20 years' experience, there's no evidence of that. He got standard release discharge instructions that had some concussion form language on that. Wouldn't that be fair to say? I mean, let's be honest about this. He had a blow to the head that required seven stitches. We're talking about a concussion. That's different because the trial court said stitches alone wouldn't be great bodily harm. Concussion alone wouldn't be great bodily harm. It's the combination of the two that leads me to conclude that great bodily harm occurred here. But the record reveals very clearly there's no evidence of concussion. Would you agree? If you just strictly listen to the doctor. And the paramedics. Who were not evaluating him for a concussion. However, any time anyone takes a blow to the head, you honestly have to think about concussion. Well, we can think about it, but we're talking about what the evidence indicates. The doctor, the treating medical professional, the MD, said no concussion. Is that right? And some other treating medical professional who wasn't the doctor felt the need to give him discharge instructions on concussions. So you're not being reasonable here. I can embrace some of your argument if you would yield some in terms of reasonableness. That's not reasonable. He got a form document that had some reference in formal language to how to treat a concussion. That's all we have as it relates to concussion. Am I right? That's all we have as it relates to concussion. But we don't just have the stitches. We have the bruises or the blows that were to the arms and the back that led him to feel as if his arms and back were broken. But the point is the trial court concluded and so found that the great bodily harm was the product of a concussion in combination with seven stitches to his ear that either one in isolation would not be sufficient to constitute great bodily harm. Would you concede that? That's what the trial court found. This is here after a finding of guilt, after a finding of great bodily harm. And on review it is our job to look at the record and view it in the evidence in the light most favorable to the prosecution upon conviction. If we're talking about just the sufficiency of the evidence. If we're talking about prejudicial error resulting from the admission of improper expert testimony, then we're talking about a plain error analysis. Now we're only asking ourselves is the evidence closely balanced or is there structural error? For that one issue and in terms of whether the evidence is closely balanced and the complaint about that expert opinion, the defendant brought in their own expert who testified to this very point and then some, and then some. He wasn't just testifying about how a police officer in this situation should be doing this and should be doing that. What he was talking about also came to the ultimate conclusion. But the reality is this. And I'm pleased. Maybe I'm a little animated and so I apologize. But the trial court in its findings embraced two pieces of evidence to formulate its conclusion. That is the deputy chief's non-qualified expert opinion and the video. Would you agree with that? I would disagree with that. Okay. But then you say in the current court's language, the court stated the testimony from the deputy chief that what the defendant did was wrong, was not part of his training, and the defendant should have taken cover and retreated. The trial court specifically said, I think retreating cover. Those were the words that stuck with me. And then viewing the video with that in mind, it all makes sense. That's what the court said. That's what the court said. The court also listened to all of the evidence in the case that included the testimony of the brother who was inside the house viewing events unfold. The neighbor who was viewing the events unfold and was so disturbed by what he was seeing that he ran over to try to stop the events as they occurred. And honestly... He came in midway, though. He didn't see the whole thing. He was outside smoking a cigarette and watched and heard and listened and then ran over midway. I have another question for you. The officers arrive on the scene, the backup officers. Now the scene is secured. At that point, they try to handcuff the driver, Bell. Isn't that right? Yes. And again, he's noncompliant. Isn't the testimony that he kept his arms at his side, clenched his fist, and refused to be handcuffed, refused to follow official commands? Yes. And then the baton had to be used again, but with great restraint. They used it as a leverage device and not to beat him into submission. Isn't that fair to say? I believe so. Okay. And isn't it also fair to say that the video reflects that once the backup officers arrived and are on the scene and it's a more secure setting, and the threat that the officer initially felt he experienced had dissipated to a great degree. At that point, the officer at some point is standing next to the defendant, sorry to strike that, the driver, Bell, and Bell gets up off the ground by raising one arm and moves towards the officer. And it's at that point that not pulling the baton, because he's no longer alone, he backs up. Isn't that right? Isn't that what happened? Honestly, I'm not sure. I was not focused on that portion. I think it was the state of mind of all the players. However, the state of mind of the driver at this point is one of fear after having sustained 15 blows with the baton. Well, in conclusion, I would perhaps rhetorically ask you that it would be unfair to view this case simply through the lens that shows only a videotape, that context is everything. Wouldn't you agree? I would agree in this case because we have multiple other witnesses. Thank you. Do you have any questions? Counsel, will you bring your argument to a conclusion? Yes. And before you do, I want to say to you, I do not mean to be personal with you, personally hostile. I get a little keyed up at a great once in a very great while, and it's perhaps your misfortune that today is that day. I apologize if I've offended you, but I don't. Nothing to apologize for. I actually enjoy a good argument. He had a cup of coffee this morning. In conclusion, it's the state's position that viewing the evidence in the light  aggravated battery and official misconduct, and we ask that you affirm the conviction and sentence. Thank you, Ms. Mahoney. Mrs. Levy, do you have some brief remarks in rebuttal? Briefly, Your Honor. Provocation was not just a word used by the trial court. It led to the fact that he never used the word reasonable once in his decision. So it's up to this court to determine whether Officer Mandarino's actions were reasonable. And I argue that his actions were reasonable. You don't have the evidence to do that because the state didn't give you that evidence. There was much more than just a video in this case. The video was two minutes long. The trial was six days long. Numerous witnesses. It's unfair to view the video in isolation, and I think, unfortunately, that's what the trial court did here. This was a high-risk stop. Officer Mandarino was confronted with multiple individuals at 345 in the morning who were trying to enter a home. He had no idea that was their home. He just knew that he had two uncooperative individuals who, even when his service weapon was pulled and pointed at them, refused to comply with his command. Counsel, did your recollection of the records indicate that the trial court commented and watched the video the night before his findings 55 to 60 times? That is what the trial court said. In your judgment, would that speak to his belief that the evidence was close and that he needed to review that video 55 to 60 times? A 16-minute video? It could. Yes, it could mean that. I do think the aid actually, I wouldn't agree. I don't think the evidence was closely balanced. Well, I do believe there was a spread of evidence. Right. I believe that the evidence favors the defendant in this case. I appreciate that. But even in the light most favorable to the state, which is what we're doing here. On this issue? Correct, and on all issues at trial. The evidence that the state presented, the trial court found incredible the testimony of the driver and the passenger. He said that they were drunk, that they weren't complying, they were trying to enter a home, and that they were motivated by their lawsuit against the village of Streamwood. He discounted their testimony. The two bystanders who testified also said the driver was not complying. They could see. He was down on all fours, but he would not lay flat. One of those bystanders who came from inside the home physically pulled the driver all the way onto the ground. He understood exactly what the officer was asking, not because the officer wasn't clear, but because the driver was drunk and he didn't understand. We then have the testimony of the treating physician, who said that there was no concussion, and that even four to five hours after this arrest, the driver was still drunk and uncooperative in a security arrest. You use the term drunk repeatedly, and sometimes we use the term interchangeably, drunk and intoxicated. It was the testimony of many individuals and the conclusion of the trial court that the driver and his passenger were intoxicated. But doesn't the record also reflect that the driver, Bell, asked personnel at the hospital, how long does it take, and when he refused a blood test and said, I'm not stupid, he asked, not how long does it take for alcohol to leave your system. Wasn't his question, how long does it take for anything to leave your system? And we don't know what the cause of the intoxication, and we can certainly infer alcohol was at least part of the cause, if not all of the cause, based on the odor of alcohol and the admission of some alcohol consumption. But we don't know the full basis for the intoxication, do we? We do not. You're right, Your Honor. We just know that he was intoxicated. We don't know why that intoxication resulted. Anything further? Let me just reiterate, the standard is reasonableness, not provocation. No reasonable trier of fact could conclude that he acted without legal justification based on the evidence that was adduced at trial, based on the testimony of the unrebutted expert, and based on the testimony of Officer Mandarino that the trial court found to be credible. Thank you. Thank you. Ms. Levy, Ms. Mahoney, I want to thank you for your arguments and your briefs. This matter will be taken under advisement. I thank you both.